455 So.2d 317 (1984)
DELTA AIR LINES, INC., et al., Appellants,
v.
DEPARTMENT OF REVENUE, Appellee.
No. 63915.
Supreme Court of Florida.
June 14, 1984.
Rehearing Denied September 12, 1984.
*318 J. Michael Huey and Stephen A. Ecenia of Akerman, Senterfitt & Eidson, Tallahassee, for appellant Delta Air Lines, Inc.
Darrey A. Davis and Juan T. O'Naghten of Steel, Hector & Davis, Miami, for appellant Pan American World Airways, Inc.
Jim Smith, Atty. Gen. and Joseph C. Mellichamp, III, Asst. Atty. Gen. and Larry Levy, General Counsel and Jane Mostoller, *319 Asst. General Counsel, Tallahassee, for appellee.
ADKINS, Justice.
This case is before us on an order from the First District Court of Appeal certifying the issue in the case to be of great public importance. We have jurisdiction. Art. V, § 3(b)(5), Fla. Const.
This case arose with the filing of a complaint by Delta Air Lines in the circuit court of Leon County seeking declaratory and injunctive relief from the enforcement of provisions of chapter 83-3, Laws of Florida, on the ground that the law was unconstitutional. Capitol Air, Inc., Northwest Airlines, Inc., Ozark Air Lines, Inc., Piedmont Aviation, Inc., Republic Airlines, Inc., The Flying Tiger Lines, Inc., United Airlines and USAir, Inc., were granted leave to intervene as party plaintiffs. On May 27, 1983, the circuit court entered its final judgment in favor of the Department of Revenue ruling the law constitutional. Delta appealed to the First District Court of Appeal which certified the case for immediate resolution by this Court.
We described the structure of chapter 83-3 and resolved some of the issues raised by Delta in our decision in Eastern Air Lines v. Department of Revenue, 455 So.2d 311 (Fla. 1984). There are two issues which Delta raises which we were not faced with in that decision.
First, Delta raises the issue of whether chapter 83-3 violates the commerce clause of the United States Constitution by providing a corporate income tax credit for Florida-based airlines. Chapter 220, Florida Statutes (1981), imposes an income tax on domestic corporations and foreign corporations qualified to do business in Florida or actually doing business in Florida. Section 61 of chapter 83-3 creates section 220.189, Florida Statutes (1983), and provides a credit against the corporate income tax for air common carriers who have a corporate or business home office in Florida and also maintain a work force of more than 1200 employees in the state. This credit offsets up to one-half of the air carriers' fuel tax liabilities with a maximum credit of $5 million.
A state tax is not per se invalid because it burdens interstate commerce since interstate commerce may constitutionally be made to pay its own way. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977); Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823 (1938). Taxes have been sustained against commerce clause challenges when the tax: 1) is applied to an activity with a substantial nexus with the taxing state; 2) is fairly apportioned; 3) does not discriminate against interstate commerce; and 4) is fairly related to the services provided by the state. Complete Auto, 430 U.S. at 279, 97 S.Ct. at 1079. No state may, consistent with the commerce clause, "impose a tax which discriminates against interstate commerce ... by providing a direct commercial advantage to local business." Boston Stock Exchange v. State Tax Commission, 429 U.S. 318, 329, 97 S.Ct. 599, 607, 50 L.Ed.2d 514 (1977); Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 457, 79 S.Ct. 357, 361, 3 L.Ed.2d 421 (1959). This principle follows from the basic purpose of the commerce clause which is to prohibit preferential trade areas destructive of the free commerce anticipated by the United States Constitution. Boston Stock Exchange, 429 U.S. at 329, 97 S.Ct. at 606; Dean Milk Co. v. Madison, 340 U.S. 349, 356, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951).
In Boston Stock Exchange the United States Supreme Court found unconstitutional a state stock transfer tax containing credit provisions which had the effect of discriminating against interstate commerce to the direct commercial advantage of local business. The transfer tax was imposed if any one of five events (sale, transfer, delivery, etc.) occurred within the state. The rate of tax was based upon the price of the security. The total tax was determined by the number of shares involved in the taxable event. The imposition *320 of the tax itself was found to be constitutional. However, the credit structure of the tax was found to be unconstitutional. The credit amendments to the tax resulted in a scheme in which intrastate sales received a preferential fifty percent reduction in the rate of tax imposed and were given a maximum tax ceiling of $350. Out-of-state sales, however, were subject to the full tax rate without any ceiling. Because it imposed a greater tax liability on out-of-state sales than on in-state sales, the New York transfer tax fell "short of the substantially evenhanded treatment demanded by the [c]ommerce [c]lause." 429 U.S. at 332, 97 S.Ct. at 608.
Another tax statute whose discriminatory credits and exemptions provided the basis for a finding of unconstitutionality was the Louisiana statute reviewed in Maryland v. Louisiana, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). There, a tax was imposed on certain uses of natural gas coming into the state. The tax was imposed to equalize competition between locally produced gas subject to the state's severance tax and gas coming into the state from the outer continental shelf which was free of the severance tax. The use tax provided an exemption for gas consumed within the state. It also provided a tax credit against severance taxes for all use taxes paid, thereby encouraging investment in local mineral exploration and development and discouraging investment and development of the outer continental shelf and other states. The Court found the statute unconstitutional in light of the discriminatory effect produced by the pattern of credits and exemptions which violated the principle of equality. 451 U.S. at 759, 101 S.Ct. at 2135.
The circuit court here found that "the tax is on fuel purchased in the state and all consumers are taxed equally" and thus concluded that there is no burden on interstate commerce similar to that found in Maryland v. Louisiana. The court misconstrued the nature of the discrimination worked against interstate commerce by the corporate tax credit. The question is not one of whether Florida may impose this tax on fuel purchased in Florida for use in interstate commerce. Rather the issue is whether the tax with its attendant credit provision produces a discriminatory effect on interstate commerce. The credit provision of chapter 83-3 clearly discriminates against interstate commerce because the corporate tax credit provides a direct commercial advantage to Florida-based air common carriers over non-Florida-based carriers.
The circuit court also found Boston Stock Exchange inapplicable stating that, in the present case, "the legislature is not trying to tax any out-of-state transactions." The circuit court misconstrued the holding in Boston Stock Exchange. The United States Supreme Court in Boston Stock Exchange was not concerned with whether the transaction occurred in New York or outside the state, but whether the credit structure of the tax favored in-state business and discriminated against interstate commerce.
The circuit court also relied on Archer Daniels Midland Co. v. State, 315 N.W.2d 597 (Minn. 1982). In Archer Daniels the Supreme Court of Minnesota struck down a tax credit statute similar to the Florida-based tax credit provided in chapter 83-3. Minnesota imposed an excise tax of thirteen cents per gallon on all gasoline sold in the state including gasohol. The taxing statute was amended in 1980 to provide a four cents per gallon partial exemption for gasohol made from Minnesota farm products and blended with alcohol distilled in Minnesota. A non-resident alcohol producer challenged the constitutionality of this statute alleging that the higher taxes imposed on non-resident producers discriminated against interstate commerce. The court found that the exemption violated the commerce clause noting that the act attempted to unfairly preserve local markets for local interests by conferring an artificial economic advantage to local interests under the state's taxing power. Id. at 599. The circuit court ruled that Archer Daniels dealt with out-of-state production or consumption and that chapter 83-3 in no way *321 affects out-of-state production or consumption. This approach again overlooks the real issue in this case. Just as the Minnesota statute favored in-state gasohol producers, chapter 83-3 confers an artificial economic advantage on those interstate air carriers who maintain corporate or business home offices in Florida over those competing air carriers who base their corporate headquarters outside the state.
The circuit court continued its erroneous analysis under the commerce clause by referring to Faircloth v. Mr. Boston Distiller Corporation, 245 So.2d 240 (Fla. 1970), as supporting the proposition that this Court has upheld special tax exemptions to encourage Florida industry. The court's reliance on Faircloth is misplaced because that case involved a challenge to a state excise tax based upon equal protection and due process arguments. The commerce clause was not an issue in that case.
The circuit court has misconstrued the analysis necessary to determine whether a statute discriminates against interstate commerce. The test under the commerce clause is, as we have noted, whether the statute discriminates against interstate commerce by providing a direct commercial advantage to local commerce. The corporate income tax credit provides a direct commercial advantage to select Florida-based air carriers and thereby violates the commerce clause.
In Eastern, 455 So.2d 311 (Fla. 1984), we discussed the proper analysis to determine whether a statutory provision was severable from the remainder of the statute. We find that the corporate tax credit provision, now section 220.189 (Florida Statutes 1983), can be logically separated from the remaining valid provisions of chapter 83-3 without hampering the legislature's intent to provide a transportation fund for the state. Thus, we strike that provision which extends a corporate income tax credit to Florida-based air carriers. We believe this will still accomplish the legislature's primary purpose  to tax corporations qualified to do business in Florida or actually doing business in Florida.
Delta also challenges section 6 of the law as being a road-user tax totally unrelated to the services provided by the state and thus violative of the commerce clause. Delta states in its brief that the first gas tax and the corresponding first four cents of the special fuel tax formerly imposed under chapter 206, Florida Statutes (1981), levied an excise tax specifically on road-users. Delta also refers to the new provision as "the new sales tax." However, the thrust of Delta's argument is that this tax is a user tax and, as such, fails the fourth prong of the text enunciated in Complete Auto. Delta argues that it and other interstate air common carriers do not use the roads in Florida and, therefore, the measure of the tax bears no relationship to Delta's presence or activities in the state.
We must disagree with Delta's argument. First, the tax is not a road-user tax. It is an excise tax imposed under part II of chapter 212, which is commonly referred to as the sales tax law of the state of Florida. The tax is imposed on the privilege of engaging in certain businesses, including the selling of motor fuels and special fuels in the state. All purchasers of motor fuel or special fuel are taxed on the incident of first withdrawal. The funds generated are to be deposited in a state transportation fund and are not, as Delta has asserted, to be restricted to only road use.
Our interpretation of this statute as an excise tax is consistent with prior United States Supreme Court decisions which reviewed similar statutes dealing with taxes on fuel used by airlines.
In 1933 the United States Supreme Court was faced with a challenge to a Tennessee statute which imposed an excise tax on the privilege of selling, storing, or distributing gasoline within the state. Nashville, Chattanooga, & St. Louis Railway v. Wallace, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730 (1933). The proceeds of the tax were to be used solely in the construction and maintenance of a highway system in the state. The appellant rail carrier contended that the tax was in effect a tax upon the use of the gasoline in appellant's business as an *322 interstate carrier and, thus, an unconstitutional burden on interstate commerce. Id. at 265, 53 S.Ct. at 349, 77 L.Ed. at 737. The court noted that gasoline having come to rest in storage is taxable by the state, notwithstanding its prospective use as an instrument of interstate commerce, much the same as a right of way, rolling stock, or other instruments of interstate commerce are subject to local property taxes. Accordingly, the Court stated:
[T]here can be no valid objection to the taxation of the exercise of any right or power incident to appellant's ownership of the gasoline, which falls short of a tax directly imposed on its use in interstate commerce, deemed forbidden in Helson v. Kentucky, [279 U.S. 245, 49 S.Ct. 279, 73 L.Ed. 683 (1929)], supra. Here the tax is imposed on the successive exercise of two of those powers, the storage and withdrawal from storage of the gasoline. Both powers are completely exercised before use of the gasoline in interstate commerce begins. The tax imposed upon their exercise is therefore not one imposed on the use of the gasoline as an instrument of commerce and the burden of it is too indirect and remote from the function of interstate commerce itself to transgress constitutional limitations....
... [T]he levy is a tax, not a toll or charge for use of the highways... .
Id. at 268, 53 S.Ct. at 350.
In Eastern Air Transport, Inc. v. South Carolina Tax Commission, 285 U.S. 147, 52 S.Ct. 340, 76 L.Ed. 673 (1932), the Supreme Court upheld a state tax on the sale of gasoline within the state. The suit was brought by an interstate air carrier which argued that the tax placed a direct burden on interstate commerce. The Court found that the tax, which was described in the statute as a license tax, was for the privilege of carrying on the business of selling gasoline. The Court emphasized that under the circumstances the validity of the tax would not be affected by whether the tax was construed to be an excise tax or a property tax. The Court stated:
There is no substantial distinction between the sale of gasoline that is used in an airplane in interstate transportation and the sale of coal for the locomotives of an interstate carrier, or of the locomotives and cars themselves bought as equipment for interstate transportation. A non-discriminatory tax upon local sales in such cases has never been regarded as imposing a direct burden upon interstate commerce and has no greater or different effect upon that commerce than a general property tax to which all those enjoying the protection of the State may be subjected.
Id. at 153, 52 S.Ct. at 341.
Similarly, the Court upheld a Wyoming law which taxed all gasoline "used or sold" in the state and applied to all gasoline imported for use upon its withdrawal from storage tanks in Edelman v. Boeing Air Transport, Inc., 289 U.S. 249, 53 S.Ct. 591, 77 L.Ed. 1155 (1933). The Court described the tax in the following manner:
The tax is applied to the stored gasoline as it is withdrawn from the storage tanks at the airport and placed in the planes. No tax is collected for gasoline consumed in respondent's planes either on coming into the State or on going out. It is at the time of withdrawal alone that "use" is measured for the purposes of the tax. The stored gasoline is deemed to be "used" within the State and therefore subject to the tax, when it is withdrawn from the tanks... .
A State may validly tax the "use" to which gasoline is put in withdrawing it from storage within the State, and placing it in the tanks of the planes, notwithstanding that its ultimate function is to generate motive power for carrying on interstate commerce. Such a tax cannot be distinguished from that considered and upheld in Nashville, Chattanooga & St. Louis Ry. Co. v. Wallace, supra. There it was pointed out that "there can be no valid objection to the taxation of the exercise of any right or power incident to ... ownership of the gasoline which falls short of a tax directly imposed on its use in interstate commerce, *323 deemed forbidden in Helson v. Kentucky, 279 U.S. 245, 73 L.Ed. 683, 49 S.Ct. 279." As the exercise of the powers taxed, the storage and withdrawal from storage of the gasoline, was complete before interstate commerce began, it was held that the burden of the tax was too indirect and remote from the function of interstate commerce, to transgress constitutional limitations.
Id. at 252, 53 S.Ct. at 592 (emphasis supplied).
The Supreme Court of the United States has stated that the constitutional power of a state to tax does not depend upon the enjoyment of the taxpayer of any special benefit from the use of the funds raised by taxation. Nashville, Chattanooga & St. Louis Railway v. Wallace, 288 U.S. 249, 268, 53 S.Ct. 345, 350, 77 L.Ed. 730 (1933). A state is free to pursue its own fiscal policies, "if by the practical operation of a tax the state has exerted power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society." Wisconsin v. J.C. Penney Co., 311 U.S. 435, 444, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1940). See also Commonwealth Edison Co. v. Montana, 453 U.S. 609, 625, 101 S.Ct. 2946, 2957, 69 L.Ed.2d 884 (1981); General Motors Corp. v. Washington, 377 U.S. 436, 440-41, 84 S.Ct. 1564, 1567-68, 12 L.Ed.2d 430 (1964). The relevant inquiry under the fourth prong of the Complete Auto test is not, as Delta seems to suggest, the amount of the tax or the value of the benefits allegedly bestowed as measured by the costs the state incurs on account of the taxpayer's activities. Commonwealth Edison, 453 U.S. at 625, 101 S.Ct. at 2957. The first prong of Complete Auto clearly requires that the interstate business (here the airlines) have a substantial nexus with the state before any tax may be levied on it. The fourth prong of the test is intended to impose the additional limitation that the measure of the tax be reasonably related to the extent of the contact. Id. at 626, 101 S.Ct. at 2958; Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823 (1938).
This tax is unlike a true "user fee" or user tax. Perhaps the best illustration of a true user tax is found in Evansville-Vanderburgh Airport Authority v. Delta Air Lines, Inc., 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972). In Evansville-Vanderburgh the United States Supreme Court reviewed a use tax imposed on airlines by an Indiana municipality. All interstate air carriers were charged a user service charge for each enplaning passenger. The monies collected were to defray the cost of airport construction and maintenance. The tax was upheld and found to be fairly related to the use of the facilities by the airlines.
The present tax is more analogous to that found in Commonwealth Edison where the United States Supreme Court upheld a Montana severance tax on coal. Coal producers challenged the tax contending that the severance tax had a discriminatory effect on interstate commerce since ninety percent of Montana's coal was shipped out-of-state and, therefore, the tax burden was borne primarily by out-of-state consumers. The Court found that the coal producers' claim hinged on an inquiry into the fourth prong of Complete Auto. First, the Court concluded that, contrary to appellant's contention, the severance tax was a general revenue tax. 453 U.S. at 621, 101 S.Ct. at 2955. The Court also concluded that the fourth prong of Complete Auto was satisfied by the Montana tax. The Court stated:
Because it is measured as a percentage of the value of the coal taken, the Montana tax is in "proper proportion" to appellants' activities within the State and, therefore, to their "consequent enjoyment of the opportunities and protections which the State has afforded" in connection with those activities.
Id. at 626, 101 S.Ct. at 2958 (citing General Motors Corp. v. Washington, 377 U.S. at 440-41, 84 S.Ct. at 1567-68).
We believe the imposition of this excise tax on the purchase of motor fuel *324 and special fuel in the state of Florida is fairly related to those purchasers' enjoyment of the protections and benefits afforded by the state and the privilege of doing business in an organized society. Delta operates in at least nine of the major airports throughout the state of Florida transporting persons and property and engaging in the business of operating a commercial airline for profit. The persons and property which are transported through the air by airlines such as Delta do not come to rest at the airports. Those persons and any property generally must then use the public roads and highways of the state in automobiles or trucks or some other means of public transportation. We must disagree with Delta's contention that the tax is invalid because it is not fairly related to the services provided by the state.
Accordingly, we affirm that portion of the circuit court's order which upheld section 6 of the law as not being violative of the commerce clause. But, we reverse the circuit court's order insofar as it upheld the corporate tax credit to Florida-based airlines and strike that section of chapter 83-3.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON, McDONALD and SHAW, JJ., concur.